May it please the court. Good morning. My name is Ethan Bauer and I speak for Tammy Thomas. I understand to watch my clock. I'm going to do my best with some electronic assistance to save three minutes for rebuttal. There are many reasons to reverse the convictions of Tammy Thomas. This morning I would like to address broadly three of them. One, the district court's refusal to provide Ms. Thomas or give the jury Ms. Thomas's theory of defense instructions. There will be two parts to that. Second, I would like to talk about the infirmities and the charging and the instructions regarding count six, the obstruction of justice count. Third and finally, if we have time, I would like to address the improper admission of the hirsutism evidence, which came to this trial and made it fundamentally unfair. Of course, we're prepared to answer any and all questions the panel may have regarding any of the other issues we've briefed. We believe those issues individually and cumulatively require reversal. But to begin with, we'd like to talk about the theory of defense instructions with regard to literal truth. As the panel well knows, as the government concedes, the defendant is entitled to an instruction to the jury on the defendant's theory of the case, provided that the defense has some foundation in the record and provided that it has a basis in law. Below and before this Court, the government has never contested that Ms. Thomas's theory of the defense regarding literal truth had a basis in fact, foundation. And it's clear it had a foundation in law, both from Braunston and from this Court's decision, beginning with Cowley. I don't think the district court ever said, you know, it didn't have a foundation in law. I think the district court's position was, you know, that proposition is adequately  I think that's right, Your Honor. I mean, just necessarily, if you instruct that the statement has to be false, by definition, if it's true, it's not false. Isn't that the district court's position? I think that's right, Your Honor. What's wrong with that? What's wrong with that is literal truth and truth, falsity and literally false, are not the same concept. And it's not something a lay juror would reasonably apprehend. And what this Court has said is an answer that conveys false information by implication cannot be used to sustain a 1623 conviction. But it doesn't say that. Each of the counts specifies exactly what the allegedly false declaration was, and each of them was a one-word answer, no. And the jury was told they had to find beyond a reasonable doubt that the testimony was false and that the defendant knew that it was false and material. So between those two elements, there's plenty of room to argue literal truth. But the problem isn't whether counsel was permitted to argue literal truth. The question is whether or not the petite jury would understand that that had a basis in law. That was a proper thing to understand. As opposed to just being lawyers' words, oh, he's saying it's not real. Well, literal truth isn't real people talk. That's lawyer talk. True and false is real people talk. And if they're told you have to prove that it's false and that the person knew that it was false, if you came up and said, well, it wasn't false, the words were actually correct, then I guess I just don't see why a jury wouldn't understand this to encompass your theory. Because under Ninth Circuit law and the Supreme Court law, her literally truthful answer may convey false information by implication. And most people think when you get false information by implication, you've lied to me. I can't trust you because you've lied by omission, you've lied by implication. That's false to everybody. But he doesn't say that in the instructions. It requires the thing that she actually said to be false, not implication, actually false is what the instruction requires. And our position is that most people define that much more broadly than the narrow sentence that 1623 has been cabined by. What is the best case you can give us, a citation that supports your position in this sense, that where the instruction is literally true, but it could imply less than the defense wants the jury to know. What is your best case that says in that kind of situation the court should give a specific instruction directed to the defense race? Well, I don't have – I really can't answer that. I'm not prepared for that question. The two citations I would give the Court, though, are, one, we've already given you the Kehoe case, which is a First Circuit case, which is basically following standard law we have in this circuit. Escobar-Dubris says in this sort of situation where there's a basis to understand that the answer would be literally true, but you could see how it's based on the grammar which this Court has adopted in both Cowley, Cash, and I shouldn't say both, this is the third case where this Court has recognized that grammar distinctions and answers can't support a little bit of truth defense. Kehoe says what? That we should get an instruction in a case such as this if a defendant asks for it. The only other district court case I – You mean this kind of case? Yes. And the other case I have, and I have – Well, I don't know what the law is in the First Circuit, but it struck me that your proposed instruction number 10 was extremely argumentative and not really so much a statement of law as an argument about the facts, and if we were to find that your instruction is not itself proper, does that make a difference to your – to what should happen here? I wouldn't believe so, Your Honor. Because the Court had a sua sponte duty to give me my theory of defense – sorry, give Ms. Thomas a theory of defense instruction, and the district court reformed many other instructions during our multiple conferences, and had she believed that 10 was argumentative, and she never – and we submitted proposed instruction 10 after she said – or initial proposed instruction 6 was argumentative. She never said that number 10 was argumentative, but the district court could have – No, I know I'm asking you that question, though, and I'm not the – United States v. Bayer, this Court has said if you're entitled to a theory of defense, then the district court must give one and must form it itself, and in this case, if it was argumentative, then the district court should have reformed it once you reformed many of the instructions, including the government's. If I could move on, the last thing on that point is I do have a case which I'll give to the clerk called United States v. Williams, the Honorable – Don't argue it to us if we don't have the citation, but you may leave copies with opposing counsel and the clerk afterwards. Thank you. I'll just touch briefly on the – our request for a jury instruction on the jurisdictional limits defense. As the Supreme Court held in United States v. Gardein, there's – the materiality inquiry is something that needs to go to the jury as an element, and as on page 512 of Gardein, as the Court said when distinguishing – when addressing this issue, it said deciding whether a statement is material requires the determination of at least two subsidiary questions of purely historical fact, A, what statement was made, and B, what decision was the agency trying to make. And Gardein was an agency decision. In our case, of course, the agency was the grand jury. And our position is that because none of the information Ms. Thomas gave to this grand jury about her ongoings with the Dalton Arnold household while they were in Colorado could have any effect on any decision the northern district grand jury could have rendered, the Petit jury was entitled to be instructed as to the limits of those decisions. There's nothing here that would have supported a connection between Arnold and Balco? Oh, Arnold was definitely connected with Balco. The question is whether the Petit jury, when addressing whether Ms. Thomas' statements about her – because her comments about Arnold had nothing to do with Balco. And we're not saying the Court didn't have jurisdiction over all of them. But Gardein says the Petit jury makes the determination of materiality, and that determination depends on what decision the grand jury was going to make. And the Petit jury needs to understand, are there any limits to those decisions? What decision was the grand jury in this case, number three, going to make? And our position was they shouldn't be – they should have understood that whatever decisions they were going to make, they had to relate to conduct that had some connection in whole or in part to the Northern District of California, a fairly uncontroversial proposition. And that theory defends the – Right. But her statements – her statements to Arnold or her relationship with Arnold and Dalton might have had some impact on other things, other people who clearly were within the jurisdiction of the Northern District of California. Her statement – well, not factually. Her statements, if we change all of her, no answers to yes, could not have led to the indictments of any person or affected any decision. It may not have been sufficient in and of itself, but it might have led to other discoverable information. I don't see how that on this record that's possible. She – her relationship with Arnold had nothing to do with Conti. Once she denies that she – that she's – that she's received anything that's illegal from either Dalton or Arnold, the government may not have any incentive to investigate any connection between Arnold and Balco. But I think you've overstated whether she's denied receiving anything illegal from Arnold or Dalton. I think we're going to get back. I don't want to eat up my time on Rule 29, but the poorly phrased questions are too Arnold-focused. And when she – they said, did you get from Arnold, and she says Dalton, the questioner doesn't follow up and doesn't get why Your Honor so quickly divined as the true facts. And so it's – they could have drilled down on that, but that's a separate inquiry whether – is anything they sold her, shipped her, gave her in any other State, does that have a jurisdictional nexus that if her answer – if the answer is a charge that's claimed to be false, that answer has to affect this grand jury's decision-making. And on this record, that's impossible. And at least we were entitled to an instruction so we could argue it because that decision is a petite jury decision after Gardena. It's no longer a judicial decision. Well, materiality, again, was an element of the instructions given. And the theory of defense is to instruct the jury on the limitations of the decision-making authority of the grand jury so they could understand how to exercise that. If I may, I know we're running quickly through my time, and I wanted to jump to issue number two, which is count six, because I have two quick arguments I'd like to make on that in the next six minutes. One, we think the immunity order barred prosecution in this case. And we want to be clear about a couple of things. The immunity order, it was – it was – she didn't ask for it. They compelled her testimony against her wishes on the day of her grand jury appearance. It didn't give transactional immunity for anything. They could have prosecuted her for anything under the sun without that order. What the order said is when we compel your testimony from you, if we don't like your testimony, we can prosecute you for perjury and false declarations. And the Supreme Court has set an alpha bomb. Those two exceptions we read as broadly as possible. So we're all in agreement. Wasn't there a third exception? Otherwise failing to comply with the order, which is in essence a contempt of court. It says you have to show up and you have to take the oath and you have to testify, and if you otherwise fail to comply with that, we're going to put you in jail for that. But obstruction of justice is a tool Congress didn't give the United States in these situations, and it wasn't enumerated. And if you just look at plain language, expressio unius exclusio authoris, you look at the rule of lenity, which really shouldn't apply because the language is so clear, they just don't have that tool. They could prosecute her for perjury. They could prosecute her for false declarations. They weren't allowed to prosecute her for obstruction. And no court of appeals has addressed this issue. It's essentially a blank slate before this Court. The courts that have addressed it, district courts, they often talk about it in a sense of, well, you're getting immunity for conduct. It's transactional immunity in those cases. And again, this is use immunity. You can't use my – you can only use my compelled words against me for – in prosecutions, for false statements or declarations, or if I fail to comply, which is contempt, this thing should have been dismissed pretrial. The second problem is, is there's a materiality element to count six. And the Court should take – we've cited the cases, but Aguilar really ends the debate. Aguilar arises out of this district. It goes to the Supreme Court. And it's plain that they say, and again, right before the majority, right before criticizing Justice Scalia's dissent, make clear that in false statement cases, it has to be material to the body in which it's in front of. They adopt the same language. They use the same language as Gardein. In fact, Aguilar has decided the same year as Gardein. These are both 1995 cases. We made a motion pretrial to have that element added to ensure that it was shown to the grand jury and pleaded. Ironically, the day before the pretrial conference, after we raised this challenge, they returned a superseding indictment, but they didn't amend this one. They didn't instruct upon it. And then the prosecutors argued to the jury that she could be found guilty based on immaterial statements. That if her statements were – if she – and read the instruction. It's page 52. If she wanted to obstruct justice, and she wanted to obstruct justice through statements, she could be found guilty. That is the – that's the sum and substance of the instruction. It's – there's no need for falsity. So if she was telling the truth, if she went in there wearing a garish dress because she thought it would be distracting, under that instruction, that would be sufficient.  And if she wanted the jury to go away, that would be sufficient. But she was titled to have materiality pleaded. And I don't – the case law is fairly clear. In this circuit, we have Rashid and Ryan, which says materiality is an element of this, is a requirement of a 1503 Omnibus Clause prosecution. And there was real reason not to plead it under Omer, which I know two of your Honors disagreed with the result in Omer. But under Omer, because it wasn't pleaded and because it's an element, it requires automatic reversal. There's no going to harmlessness. Lastly, I'd like to move to the hirsutism evidence. One of the things that plagued this trial was the government proceeded to trial on a theory that Ms. Thomas had used testosterone in the late 90s. And she had. And they had a doctor, the doctor she went to in 2000, who she admitted it to, made statements to about it. They were going to introduce this hirsutism evidence as a way to prove that she had been dishonest when she said she didn't ever take anabolic steroids. The problem with this was, during the grand jury testimony, she admitted to the grand jury that she had ingested testosterone during this time frame. And she was told by the questioner, well, no, I'm not asking about that. I know all about that. He didn't. But only with regards to Arnold. My questions now will be with regards to Arnold. But they proceeded the trial using the testosterone evidence. And pretrial, Ms. Thomas said, this is what they're doing. This testosterone evidence is emotionally charged. The photographs, the medical charts, it's very personal. And it has nothing to do whether in 2001. Well, it has to do with whether she knew about anabolic steroids and what they were and whether she had received them from Mr. Arnold. Well, whether she took testosterone in 1988 and 1999 had nothing to do with any of the six questions that were charged. Whether she received stuff from Arnold is whether she received stuff from Arnold. Those are separate inquiries. Temporarily, they were separated by a number of years. Well, some of her literal truth defense appeared to be, well, gee, I didn't know that this was really the same stuff that we're talking about. I think it was intended to go to her knowledge of what she was up to and her knowledge that she was not being literally true or figuratively true. Actually, I would respectfully disagree. In my last minute and a half, I'm going to run through what her literal truth defense  I'm the one that presented it. One of the questions was, did you ever take anything Patrick Arnold gave you? The trial evidence established that everything that she received from the Arnold Dalton household was a sale, either for a bicycle or for cash money. She was never given anything. So it was literally true because that's how you define the language. It was susceptible to that interpretation. It was real, properly instructed. A jury would have so found. She was asked whether or not she had ever received any services or products from Arnold, and she responded, no other products. And this was literally true because, as she testified, as Dalton testified, she only contacted Dalton. She was the middleman. The case agent wrote in his report that if that's true and that's her recollection, they may be literally true. I have three minutes left, according to Church. The other two other questions, so now that's two of the five, whether she had taken anabolic steroids. The testosterone was ultimately banned, which was an anabolic steroid. Her position there was literally true just because THG and Norbolithone were not anabolic steroids. They weren't progestins. They weren't proven not to be progestins. And they were the fact that they were added to the list afterwards is strong evidence that they weren't anabolic steroids either at the time she took them or at the time she testified. And she further established that the one person who testified that they were anabolic Is the statutory definition of anabolic steroids necessarily the entire universe of anabolic steroids? Oh, I think it needs to be for the Federal trial. The notion she's obstructing justice into the investigation of anabolic steroids, then it has to be, or illegal steroids, then the only steroids that are illegal are anabolic steroids under Title 21. Otherwise, the government's investigating rules of sport. But the question was not, you know, with regard to whether they're illegal or not. I mean, there is testimony that these are anabolic steroids, right? Not for THG. There was testimony about Norbolithone being an anabolic steroid under the old WIA standard. But the doctor who used it did not use the Federal definition of whether it was a progestin or not. That's my question. Why is it limited to the Federal definition? Well, if not, then it doesn't have any limitation. What the rest of the testimony was is we don't know what anabolic steroids are because different people define them different ways. It just has to do with, you know, ordinary language. I mean, just like, you know, give. I mean, there's no Federal definition of give. Not that I know of, Your Honor. With my minute and 15 seconds remaining, I'd hope you'd give me some more time. But if not, I'll reserve that. We'll have your minute for rebuttal when the time comes. Thank you. Thank you. Ms. Graham. May it please the Court. Good morning. My name is Lori Gray. I represent the United States. The Defendant raised seven issues in her appellate brief and argues here three before the Court. I'll begin by addressing those arguments in the reverse order raised. At the outset, the evidence is overwhelmingly demonstrated that the Defendant lied to the grand jury. And that those lies were proven through the testimony of Patrick Arnold and Dalton and by her positive drug test. Segueing into her requested jury instructions, Defendant's answers were not like those in Braunston and Kehoe, where though evasive, they were literally true. There was no basis in the facts to give those instructions because Defendant's answers were just flat-out false. And if I can give the Court the example from those two cases. In Braunston, which was a bankruptcy investigation, it was obviously important to determine the assets of the Defendant. There, the Defendant had previously had a bank account in Switzerland, but not at the time he was questioned. Braunston was asked, question, do you have any bank accounts in Switzerland? Answer, no. Question, have you ever? He responded, the company had an account. That was evasive, but literally true. Likewise, in Kehoe, which Defendant cites here as authority, the government was investigating a robbery, and the evidence was that Kehoe had remained in the getaway car while three men went inside the apartment of the bank manager. And at grand jury, Kehoe was asked, have you ever been to the particular apartment? And he said, no. Literally true. He was the driver sitting in the car. Here, to the contrary, Defendant's answers were flat-out false. Count one, when she was asked, have you received any products, any other products other than the legal A1D, she responded, no, no other products. The testimony at trial was very clear from Patrick Arnold that he recalled, quote, for sure, sending her THG at least one time, and the testimony was corroborated by the financial evidence. With regard to count three, this is where Defendant denied ever taking anything that Arnold gave her. Clearly, that was proven to be a flat-out lie by the positive test results. With regard to count four, that's where Defendant denied ever taking an antibiotic. Your statement you just made has nothing to do with the defense. The defense has to do with the meaning of give. Right. And as I noted – And there is no testimony that Arnold ever made a present to her, a gift to her of any steroids, right? That's correct. Well, so isn't it possible it could be literally true? Looking at the context, Your Honor, I would disagree that it's possible. And as a matter of fact, as I referenced in our – The question is, you know, whether the Defendant, whether there's a basis in the evidence that the Defendant could have understood the word to have that meaning. And the answer is yes, isn't it? I think, if I may, Your Honor, the answer is no, looking at her later conversation during the grand jury with one of the grand jurors, when they said, well, why didn't you get this from the nutrition store? And she said, well, because it was cheaper. Clearly, they weren't talking about why didn't you shoplift it. That's an argument you can make to the jury, but it doesn't, you know, it doesn't destroy her defense as a matter of law. But it doesn't give it the basis in the facts, because, again, she denied taking anything, and we have the positive test results. So your position is these – the literal truth defense has no basis in fact, and that's a – that's a proper reason for refusing the instruction. In this case, yes. If we should conclude otherwise, that there is a basis of fact in the evidence, we should reverse. No. The standard is abuse of discretion. And in this particular case, as already noted by Judge Graber, the jury was properly instructed that the defendant had the government's burden of proof. Proof beyond a reasonable doubt was that each statement was false and that the defendant knew it was false, and that's what the evidence showed. If you had a case in which – in which a literal truth defense you thought was properly – where the government thought it was properly supported in the facts, then in that case, would they have been entitled to the – to Ms. Connell's proffered instruction? I think, again, that's what would be within the discretion of the court. You've made a different argument than I thought might develop here. You've argued that there was no basis for it, and therefore the district court absolutely could not have given the instruction. I thought the government's response was the instruction as given was absolutely correct and should have – and would have alerted the jury to the possibility of a literal truth defense. That's a very, very different – that's a very different posture. Well, I think they're both correct, that the facts in this case did not merit giving that, and the district court said, listen, it's argumentative. I think the reason she found it argumentative was it wasn't supported by the facts. But what you're asking for is subsumed in the instructions that the jury is being given. And as a matter of fact, if this Court were to find that they should have gotten that instruction, any error would be harmless. Defendant argued extensively with regard to each of those false statements counts that they were literally true, went through at great length to make the arguments that made today. And as I said, the evidence was overwhelming that the defendant just flat-out lied. I'd like to address just briefly the fourth false statement count – or, excuse me, the third false statement count she was found guilty of, which was where she denied ever taking an anabolic steroid. The testimony at trial from Dr. Catlin established that nirbolethone was an anabolic steroid. Defense tried to muddy the water on cross-examination by talking about progestins, but Dr. Catlin made clear that you're talking about something completely different, that this was an anabolic steroid. That testimony was uncontroverted. It was not rebutted. Defendant never called an expert. The jury obviously gave – made the credibility determination that Dr. Catlin should be believed on his testimony with regard to that. With regard to the issue of obstruction of justice, Defendant's immunity order did not insulate her from a perjury prosecution. The courts that have considered this exact issue, and I would – counsel concedes that. What he's arguing is that she wasn't insulated from perjury, but should have been insulated from obstruction of justice as a separate count. At least that's how I understood his oral argument today. I would point the Court to those district court cases, and they are district court cases cited in the government's brief, particularly DeSalvo out of the Eastern District of New York, which talks about that the language of Section 602 is comprehensive enough to extend to any conduct aimed at the – at frustrating the purpose of the immunity order, and surely this would include obstruction of justice. But as I know the Court is well aware, regardless of this, the two of the counts that the jury found in the special verdict form under obstruction of justice were based on the false statements, and those false statements required materiality. So the jury necessarily made a materiality finding with regard to the facts of the  Sotomayor, what is the evidence that supports the materiality finding on those two statements? The evidence was that the grand jury was investigating the illegal distribution of drugs by Balco and Victor Conte and others associated with him, which included Patrick Arnold, which the evidence established he was the manufacturer of the anabolic steroid known as the Clare. The search warrant was executed at Balco in September 2003. Tammy Thomas was subpoenaed to appear before the grand jury in November 2003. As part of that Balco search, three significant pieces of evidence were found that tied Tammy Thomas to Arnold and to Balco. Those were the three things that made her testimony material. First, there was a May 1st, 2002 facsimile document from Arnold to Conte in which he references Tammy Thomas' positive urine sample for Nobolithone in March of 2002. Second, there's a May 1st, 2002 email exchange between Arnold and Conte, and Arnold says in that email he knows the girl, quote, snagged for Nobolithone. He says she is trying to fight it, and Arnold is advising her technically how to do that. And indeed, he testified at trial that he told her, well, you should say something about the morning-after pill, because that contains a – that's close enough, it contains a progesterone. And in fact, at the grand jury, in response to one of the grand jurors' questions, Thomas – She does answer that. Thomas does answer that. The third piece that makes it material and ties her to this particular investigation is an October 6th, 2003 email exchange between Arnold and Anne Frank. It was determined that Anne Frank was Tammy Thomas, and in that, she indicates that she had contacted Victor Conte with regard to the ban in front of the United States Anti-Doping Agency, and that her understanding was after the hearing, quote, he was supposed to clean house, but apparently he did not. That intimated that there was more information to be revealed, to be developed, that she alone possessed information about, and that made her testimony material. And this was information that was presented to the jury. With regard to the evidentiary rulings, again, the district court did not abuse its discretion in admitting evidence regarding defendant's appearance at trial. Defendant's appearance was relevant to whether she knowingly made false statements, an element of that offense. Because of her prior contacts with Dr. Weirman, defendant knew of the jarring physical effects from being exposed to anabolic steroids. As a result of her striking appearance, during the time period it was proven that she received nerbolithone from Arnold, the evidence showed she knowingly used steroids. It wasn't an accident or mistake. And this appearance was highly probative. There was no other explanation. It demonstrated that she knowingly lied when she told the grand jury that she had not taken steroids. The district court said that the proof couldn't be based on her interaction with Dr. Weirman. And, indeed, the jury was instructed that they could not find on that. The government respected that limitation, and the jury found defendant guilty based on the false statements that she made, having received the steroids from Patrick Arnold. If the Court has any other questions, I'm happy to answer them. If you don't have any other questions, I'd submit it on the briefs and on the argument. I don't believe we do. Thank you. Mr. Bellow, you have a minute remaining. I'll be brief. Thank you for your patience today. I actually just want to go through the counts of conviction, or the counts that are alleged. I think they will shed light on some of the issues we've raised. I'll begin with counts four and five, because they're similarly worded. Count four was, now let me ask you, as you sit here now and before this grand jury today, have you ever taken anabolic steroids? The answer was no. The conviction, the jury said guilty. Count five. I want to ask you again, you know, Ms. Thomas, and again, mindful that everything has got to be truthful here, did you ever get an anabolic steroid from anybody in connection with your training up to the time of March 2002? The answer was no. The jury's verdict was unanimous acquittal. It's really almost impossible to figure out what's false about one and what's true about another. It can't go against the word of anabolic steroids, because we know that although they introduced the women evidence over objection, she told the grand jury she took testosterone. She never lied to the grand jury about testosterone. And so it has to be one or the other, but you can't reconcile those two. Both are literally truthful. Two and three have similar, and I'm assuming over time I'll stop when you tell me, but if I can go through them, I'd appreciate it. I think we understand your position from your argument and from your briefs, which have been very helpful. Thank you kindly, Your Honor. Thank you. Thank you. The case just argued is submitted, and we'll stand adjourned for this morning's calendar.
judges: Tashima, Graber, Bybee